IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| ANNIE YVONNE HARRIS, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Intervenor | ) | |
| | ) | |
| NATIONAL EDUCATION | ) | |
| ASSOCIATION, INC., | ) | |
| | ) | |
| Plaintiff-Intervenor | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:66cv2455-MHT |
| | ) | (WO) |
| CRENSHAW COUNTY BOARD OF | ) | |
| EDUCATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

OPINION

In this longstanding school desegregation case, the
plaintiffs, a class of African-American students,
obtained relief from race discrimination in the
operation of a <u>de jure</u> segregated school system. The
defendants are the Crenshaw County Board of Education and
its members and superintendent, as well as the Alabama

State Board of Education, its members, the State Superintendent of Education, and the Governor of Alabama. The school board and its members and superintendent have moved for declaration of unitary status and termination of this litigation.  Based on the evidence presented, the court concludes that this litigation should be terminated as to those defendants.

## I.   BACKGROUND

### A.   Early Litigation and the 1998 Consent Decree

This case began in 1966 when Anne Yvonne Harris, representing black students and their parents, sued the Crenshaw County Board of Education and its superintendent seeking relief from the continued operation of a racially segregated school system.  On September 12, 1966, the United States was granted leave to intervene as plaintiff-intervenor in order that the public interest in the administration of justice would be represented.  A

2

desegregation plan for the Crenshaw County Public Schools was ordered in 1970.

On February 12, 1997, this court entered an order affecting eleven school systems, stating that the court was "of the opinion that the parties should now move toward 'unitary status' ... and for the termination of the litigation [for the school systems] in these cases." Following extensive discovery and negotiations by the parties, the court approved a consent decree on June 16, 1998, finding that the Crenshaw County School District had achieved unitary status in the areas of transportation and facilities.  Further remedial action was found to be necessary in the areas of faculty hiring, promotion and assignment; student assignment; and instruction within schools, including special education, graduation and student discipline.  Courts may allow partial or incremental dismissal of a school desegregation case before full compliance has been achieved in every area of school operations; jurisdiction

is retained over the remaining parts of a desegregation case. <u>Freeman v. Pitts</u>, 503 U.S. 467, 490-91 (1992).

The parties agreed that in order for the district to attain unitary status in the remaining areas, the school board would undertake certain actions including developing policies and procedures in the identified areas to eliminate the remaining vestiges of the dual system. The consent decree set forth in detail the areas to be addressed and the actions to be undertaken. In other words, the consent decree represented "a roadmap to the end of judicial supervision" of the Crenshaw County School System. <u>NAACP v. Duval County Sch. Bd.</u>, 273 F.3d 960, 963 (11th Cir. 2001). The school board was required to file a comprehensive report with the court each year, and the plaintiff parties had the opportunity to advise the school system of any concerns about compliance with the terms of the 1998 consent decree. Concerns raised by the plaintiff parties were noted in annual progress reports and discussed at yearly status conferences. The

4

school board addressed these concerns through continued review and modification of its programs. Impasses regarding the sufficiency of the board's actions were referred to a U.S. Magistrate Judge for mediation. The 1998 decree provided that the board could file for dismissal of the case three years after filing the third annual report.

### B. The 2006 Motion for Declaration of Unitary Status

The Crenshaw County Board of Education filed its motion for declaration of unitary status and termination of this litigation on May 1, 2006. A fairness hearing was scheduled for June 30, 2006.

The court required the school board to give all plaintiff class members appropriate notice of the motion as well as procedures for lodging objections. After the court approved the notice form, the school board published, in local newspapers over a three-week time period, notice of the proposed termination of this

litigation and the date of the fairness hearing. The
notice also provided procedures for class members and
interested persons to file comments and objections with
the court regarding the proposed dismissal of this
lawsuit.  Copies of all relevant documents--the unitary
status motion, 1998 consent decree, and annual court
reports--and forms for objections and comments were made
available at each Crenshaw County public school facility,
the Luverne Public Library, the Brantley Public Library,
and the local school board office.  On June 30, 2006, the
court held a fairness hearing on the motion for
declaration of unitary status and termination.

The court concludes that the school board complied
with the directives of the court in providing adequate
notice of the proposed dismissal to class members as well
as to the community. Fed. R. Civ. P. 23(e).

## II.  DISCUSSION

### A.  Standards for Termination of a
### School Desegregation Case

It has long been recognized that the goal of a school desegregation case is to convert promptly from a de jure segregated school system to a system without 'white' schools or 'black' schools, but just schools. Green v. County Sch. Bd. of New Kent, 391 U.S. 430, 442 (1968). The success of this effort leads to the goal of ultimately returning control to the local school board since "local autonomy of school districts is a vital national tradition." Freeman v. Pitts, 503 U.S. 467, 490 (1992) (quoting Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 410 (1977)). Returning schools to the control of local authorities "at the earliest practicable date is essential to restore their true accountability in our governmental system." Id.

The ultimate inquiry concerning whether a school district operating under a school desegregation order to dismantle a de jure segregated school system should be

7

declared unitary is whether the school district has complied in good faith with the desegregation decree, and whether the vestiges of prior de jure segregation have been eliminated to the extent practicable. NAACP, Jacksonville Branch v. Duval County Sch., 273 F.3d 960, 966 (11th Cir. 2001) (citing Missouri v. Jenkins, 515 U.S. 70, 88 (1995), and Freeman v. Pitts, 503 U.S. 467, 492 (1992)); see also Manning v. School Board of Hillsborough County, 244 F.3d 927, 942 (11th Cir. 2001); Lockett v. Bd. of Educ. of Muscogee County, 111 F.3d 839, 843 (11th Cir. 1997).

In addition to these articulated constitutional standards, here the school board was also required to comply with the contractual requirements of the 1998 consent decree which set forth specific steps the Crenshaw Board was to take to attain unitary status. NAACP, Jacksonville Branch, 273 F.3d at 963. The parties agreed that the school board would analyze and review programs and practices in each of the areas in which

8

further actions were required. The board was to formulate and adopt procedures and practices designed specifically to address each of these areas. The board was thus required to take specific actions to address concerns the parties argued were vestiges of the prior dual system, and to ensure that the district was being operated on a nondiscriminatory basis.

The legal standards for dismissal of a school desegregation case were set forth in the 1998 consent decree as (1) whether the district has fully and satisfactorily complied with the court's decrees for a reasonable period of time; (2) whether the vestiges of past discrimination have been eliminated to the extent practicable; and (3) whether the district has demonstrated a good-faith commitment to the whole of the court's decrees and to those provisions of the law and the Constitution that were the predicate for judicial intervention. Missouri v. Jenkins, 515 U.S. 70, 87-89 (1995). By emphasizing that the good-faith component has

two parts (that is, that a school district must show not only past good-faith compliance, but a good-faith commitment to the future operation of the school system), the parties looked both to past compliance efforts and to a good-faith commitment to the future operation of the school system through "specific policies, decisions, and courses of action that extend into the future." <u>Dowell v. Bd. of Educ. of the Oklahoma City Pub. Sch.</u>, 8 F.3d 1501, 1513 (10th Cir. 1993) (citations omitted). Regardless, "[t]he measure of a desegregation plan is its effectiveness." <u>Davis v. Bd. of Sch. Comm'rs</u>, 402 U.S. 33, 37 (1971).

### B. Terms of the 1998 Consent Decree and Compliance Efforts

1. <u>Faculty and Administrator Hiring and Assignment</u>: The school board was required (i) to take specific steps to increase the number of African-American applicants in the pool from which it selects its teachers and administrators to fill administrative and faculty

10

vacancies, and (ii) to develop policies and procedures to ensure that faculty and staff were assigned to schools across the district such that the proportion of minority staff, faculty, and administrators at each school is substantially the same as the ratio district-wide. Singleton v. Jackson Municipal Separate Sch. Dist., 419 F.2d 1211, 1218 (5th Cir. 1969).

As evidenced by the annual reports filed with the court, the district has undertaken a number of efforts to recruit and employ minorities. Significantly, the district created a central office position called Consent Decree Coordinator and assigned a long-term African-American employee to fill the position. Under the leadership of the Consent Decree Coordinator, the district revised its employment procedures and developed and implemented a plan to increase the recruitment of minority faculty, staff, and administrators.

The district's faculty-recruitment strategies included development of a Unitary Status Handbook that

has been in place since June 2002; appointment of a Minority Recruitment Committee whose membership includes a board member, district employees, and community members, several of whom are African-American; creation of a Recruitment Team Handbook for use by the recruitment committee; expanded on-site recruiting at historically African-American colleges and universities in Alabama and other colleges and universities in the immediate area which grant degrees in education; encouraging all faculty, particularly African-American faculty, to participate actively in recruitment efforts; establishing chapters of Future Teachers of America at each of the district's schools to interest local students in becoming teachers; and funding scholarships to assist current district employees in completing their degrees in teacher education.

In 1997-98, 12 % of the teachers in Crenshaw County public schools were African-American. At the time of the hearing, the number of African-American teachers had

12

increased to just over 14 %.  The teachers were distributed among district schools as follows: Highland Home, 13 % African-American; Brantley, 11 % African-American; and Luverne, 15 % African-American.

2.  <u>Student Assignment</u>:  The 1998 consent decree required the school board to ensure that student assignment to schools was made on a nondiscriminatory basis with strict enforcement of established zone lines. <u>Cf</u>. <u>Singleton</u>, 419 F.2d at 1211.  The board complied with this provision and annually verifies the residency of new students to the system to ensure that student assignment conforms to the district's boundary lines.  The board adopted a policy providing that students seeking to transfer into district schools from outside Crenshaw County have permission from the superintendent of their home district.  This requirement has effectively stopped transfers from outside the county.

3. <u>Student Instruction</u>:  The 1998 consent decree addressed several areas involving student participation,

13

particularly by African-American students, in special programs such as college preparatory, gifted and talented, and honors and advance placement classes. To ensure that such special programs were operated on a nondiscriminatory basis, the board formulated and adopted procedures to provide notice to parents and students regarding the availability of these programs and to recruit African-American students to participate in them. The board's efforts included placing special emphasis on 'Child Find,' an annual event with the state targeting participation in the gifted program; sending letters home from the principal telling parents about special programs; and advertising the programs in local media, both cable and newspaper. The superintendent annually reviews student participation in special programs.

The number of African-American students in the gifted program has increased over the life of the consent decree. For the 2005-06 school year, African-American student participation stood at 16.9 %.

14

4.   <u>Extracurricular Activities</u>:   The 1998 consent decree required the board to take all reasonable steps to ensure an equal opportunity for all students to participate in extracurricular activities, including providing notice about activities to students and parents, recruiting African-American faculty members to be sponsors, and monitoring participation in extracurricular activities.   The school system has made a sustained effort in this area, by working to inform and recruit all students in extracurricular activities and maintaining records that reflect the racial makeup of students participating in school activities.   These efforts have resulted in increased minority participation in extracurricular activities during the term of the consent decree.   Additionally, approximately 40 % of current minority employees sponsor a student organization or extracurricular activity.

5.   <u>Student Discipline</u>:   The school board was required to ensure that student discipline was meted out

on a nondiscriminatory basis, which entailed tracking discipline referrals and reviewing referrals that exceeded the racial makeup of a individual school by more than 10 %. The record reflects that the board complied with this provision of the consent decree.

6. <u>Graduation and Diplomas</u>: The school board was required to identify students who were at risk of dropping out of school for intervention programs and to review the effectiveness of drop-out prevention programs. The board was also required to review the incidence of special education and disciplinary designations among students who failed to graduate, and, to the extent practicable, to ensure that the distribution of the Certificate of Completion was not racially disproportionate.

The annual reports document the board's efforts in this area. In the spring of a student's eighth grade year, the district invites the parents of rising high school freshmen to an information session where

16

requirements of the three graduation tracks are explained. Parents are encouraged to start with the higher track because it is easier to move from a higher track to a lower track than vice-versa. A document filed at the direction of the court discloses that, for the 2005-06 school year, the diploma distribution among the three district schools was as follows:

| Diploma | Total Issued | Percent Black |
|---|---|---|
| Advanced Diploma | 52 | 31 |
| Regular Diploma | 45 | 33 |
| Cert. of Attendance | 14 | 64 |
| Cert. Of Completion | 10 | 70 |

7.  <u>Special Education</u>: The state-wide issues involving special education were resolved by a consent decree entered on August 30, 2000. <u>Lee v. Butler County Bd. of Educ.</u>, 183 F. Supp. 2d 1359, 1366 (M.D. Ala. 2002) (Thompson, J.). According to the terms of the state-wide decree, any claims in the area of special education would be raised with the state defendants. Even if any such claim involving the Crenshaw County School System were pending, it could not prevent a declaration of unitary

17

status since the matter would be addressed with the state defendants as part of the commitments made under the state-wide decree.

8.   <u>Future Action</u>: The school board understands that the declaration of unitary status does not relieve it of its responsibility to its faculty, staff, students, and the community it serves.  To this end, on April 18, 2006, the board adopted a resolution which acknowledges the commitment of the school board to maintain the improvements in the district that resulted from its efforts to comply with the consent decree.

9.   <u>Monitoring</u>:  The school board filed three annual reports, as required by the 1998 consent decree, as well as a fourth annual report submitted at the plaintiff's request.   Each report detailed the school district's efforts and accomplishments in implementing the provisions of the decree during the preceding school year. These reports were reviewed and monitored by the plaintiff parties who were given the opportunity to advise the board of any continued concerns about these

efforts.    Progress reports were filed outlining the positions of the parties for discussion at the annual status conferences.

### C.  June 30, 2006, Fairness Hearing

As stated, after the school board and its members and superintendent filed their motion for declaration of unitary status and termination of this litigation, the court required publication and notice of the proposed dismissal, scheduled a fairness hearing, and established procedures for filing comments and objections.    No objections were filed with the court.

The court conducted a fairness hearing on June 30, 2006, and heard testimony and received evidence offered by the school board in support of the motion for unitary status and termination. Kathi Wallace, Superintendent of Crenshaw County schools, testified concerning the school board's affirmative efforts to comply with the consent decree.  As of April 24, 2006, 34 % of the students enrolled in Crenshaw County schools are African-American,

and the county's three schools range from 31 % to 37 %
African-American.  Superintendent Wallace testified that
the board is committed to continuing its good-faith
compliance strategies, as evidenced by the board's April
18, 2006 resolution.  The superintendent emphasized that
the board will continue vigorously recruiting, assigning,
and attempting to retain African-American faculty and
staff if the court declares the district unitary.
Counsel for the plaintiff parties stated no objection to
the request for unitary status.


                        III. CONCLUSION

     On the basis of the record evidence, witness
testimony, and averment of counsel, the court finds that
the Crenshaw County Board of Education and its members
and superintendent have met the standards entitling the
school district to a declaration of unitary status and
termination of this litigation.  The board has fully and
satisfactorily complied with the orders of this court.
The vestiges of the prior <u>de jure</u> segregated school

system have been eliminated to the extent practicable.
The court also finds that the board and its members and
superintendent have demonstrated a good-faith commitment
to the whole of the court's decrees and to those
provisions of the law and the Constitution that were the
predicate for judicial intervention in this school system
in the first instance, through their compliance with the
court's orders over the years, through their good-faith
implementation of their contractual obligations under the
1998 consent decree, and through their adoption of
specific policies and actions that extend into the future
demonstrating their commitment to operating the school
system in compliance with the Constitution.

The plaintiff parties have succeeded in the task they
began decades ago to seek the end of the seemingly
immovable <u>de</u> <u>jure</u> system of school segregation in
Crenshaw County.   This lawsuit sought to bring the
district into compliance with the constitutional
requirement of equal protection under the law, and the
court states today that they have succeeded.   <u>NAACP,</u>

Jacksonville Branch v. Duval County Sch., 273 F.3d 960, 976 (11th Cir. 2001).  By its actions today, the court recognizes and congratulates the sustained efforts of the parties.  In so doing, the court notes, as the Eleventh Circuit stated in Duval County School, that "[t]he Board, and the people of [Crenshaw County] who, in the end, govern their school system, must be aware that the door through which they leave the courthouse is not locked behind them.  They will undoubtedly find that this is so if they fail to maintain the unitary system [the court] conclude[s] exists today."  Id. at 976-77.

Therefore, with the judgment the court will enter today, control over the Crenshaw County School System is properly returned to the Crenshaw County Board of Education and its members and superintendent.  The motion for declaration of unitary status and termination of this litigation filed by the board and its members and superintendent will be granted, all outstanding orders and injunctions will be dissolved, and this litigation dismissed as to the board and its members and

22

superintendent.   However, the state defendants are not dismissed, and the orders dealing with the state-wide 'special education' and 'facilities' issues are not dissolved.

DONE, this the 11th day of September, 2006.


  /s/ MYRON H. THOMPSON  
UNITED STATES DISTRICT JUDGE